UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| John T. McMahan and Northwestern Nasal and Sinus Associates, S.C., | ) ) ) |
| Plaintiffs, | ) ) ) Case No. 12-cv-04356 |
| v. | ) ) Judge Sharon Johnson Coleman |
| Deutsche Bank AG, Deutsche Bank Securities, Inc. d/b/a Deutsche Bank, Robert Goldstein, and American Express Tax and Business Services, Inc. n/k/a McGladrey & Pullen, LLP, | ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs brought suit against Deutsche Bank AG, Deutsche Bank Securities, Inc., Robert Goldstein, and American Express Tax and Business Services, Inc. ("AMEX") for their alleged involvement in a conspiracy to create, market, sell, and implement the now invalidated Son of Bond and Option Sales Strategy tax shelter ("Son of BOSS shelter"). After years of litigation, the only remaining claim is against Deutsche Bank AG and Deutsche Bank Securities, Inc. (together, "Deutsche Bank") for aiding and abetting a breach of fiduciary duty. Plaintiffs allege that the now-defunct law firm of Jenkens & Gilchrist ("Jenkens") breached its fiduciary duty to Plaintiffs by misrepresenting the chances that the IRS would approve Plaintiffs' use of the Son of BOSS shelter and that Deutsche Bank induced, participated in, and provided substantial assistance for the breach. Before this Court[1] is Deutsche Bank's motion for summary judgment, which is limited to whether the statute of limitations bars the remaining claim. For the following reasons, Deutsche Bank's motion [140] is granted.

---

[1] This case was reassigned to this Court from the Honorable James B. Zagel on October 26, 2016.

**Background**

Plaintiffs failed to file a response to Deutsche Bank's Local Rule 56.1 statement of facts. All of of Deutsche Bank's statements of fact are therefore admitted. LR 56.1(b)(3)(C).

Between June 2000 and December 2001, Plaintiff McMahan participated in at least three meetings during which some of the defendants encouraged him to implement the Son of BOSS shelter.[2] (Dkt. 142 ¶¶ 1, 9). Goldstein was present at all three meetings. An attorney from Jenkens and two representatives from Deutsche Bank attended at least one of these meetings together. (Id. at ¶ 9). At all three meetings, at least one defendant suggested that the Son of BOSS shelter was a legitimate investment strategy and was valid, legitimate, and legal under federal laws. (Id. at ¶¶ 2, 10).

In connection with McMahan's participation in the Son of BOSS shelter, Jenkens drafted a letter opining that the shelter would "more likely than not" be upheld by the IRS. (Id. at ¶ 3; Dkt. 143-3 at 11). Goldstein represented to McMahan that Deutsche Bank would execute the underlying Son of BOSS transactions and that AMEX would prepare McMahan's tax returns in accordance with Jenkens's advice. (Dkt. 142 ¶¶ 4, 5). McMahan implemented the Son of BOSS shelter and used the resulting losses on his tax returns for 2000 and 2001. (Id. at ¶¶ 8, 11, 14). Deutsche Bank served as a counterparty to the foreign currency transactions underlying McMahan's 2001 shelter. (Id. at ¶ 12). McMahan paid fees to AMEX, Goldstein, Jenkens, and Deutsche Bank in 2001 in connection with his 2001 Son of BOSS shelter. (Id. at ¶ 13).

In 2002, Goldstein advised McMahan that the Son of BOSS shelter was no longer legitimate. (Id. at ¶ 15). He also advised McMahan that he could not use any more of the losses generated in 2001 as a result of the Son of BOSS shelter. (Id.).

---

[2] The Son of BOSS shelter is a strategy that was designed to reduce a taxpayer's capital gain resulting from an asset sale through a series of steps by which the taxpayer obtains long and short foreign currency options and contributes them to a partnership.

On July 23, 2003, Thomas Denney and others filed a class action suit against Jenkens, Deutsche Bank, and others in the Southern District of New York (the "*Denney* suit" and the "*Denney* class"). (Id. at ¶ 17). The *Denney* class sought damages for claims arising out of the promotion and implementation of tax strategies similar to the Son of BOSS shelter. (Id. at ¶ 17). The *Denney* class alleged that Jenkens breached its fiduciary duty to the class members by "issuing opinion letters expressing 'canned' and 'prefabricated' opinions that were incorrect." (Id. at ¶ 18). The class also alleged that Deutsche Bank assisted Jenkens in its breach by executing the underlying transactions, failing to advise the taxpayers of the falsity of the Jenkens opinion letters, and by assisting in the promotion of the tax shelter. (Id.). McMahan was a member of the *Denney* class. (Id. at ¶ 19). Prior to February 2004, McMahan hired Chuhak & Tecson, PC ("Chuhak") as tax counsel to advise him on his use of the Son of BOSS shelter and to represent him with respect to the *Denney* suit and other tax related matters. (Id. at ¶ 20). On February 24, 2005, Chuhak sent McMahan a letter indicating that Jenkens had agreed to settle the *Denney* suit for $81.5 million. (Id. at ¶ 21). On September 28, 2007, McMahan submitted a claim form to the settlement fund. (Id. at ¶ 22).

On February 19, 2004, a Chuhak attorney sent Deutsche Bank a letter in which he expressed concern about the advice Jenkens had given McMahan. Jenkens had advised McMahan that the Son of BOSS shelter was not the type of transaction that required disclosure of McMahan's identity to the IRS; McMahan, however, had also been advised that the IRS might not be bound by Jenkens's opinion. (Id. at ¶ 24). Accordingly, the Chuhak attorney requested that Deutsche Bank invoke the attorney client privilege on McMahan's behalf and not disclose McMahan's identity to the IRS. (Id. at ¶ 25). This Court notes that it is unclear when, and under what conditions, Deutsche Bank would have had to disclose McMahan's identity to the IRS.

In 2002, the IRS offered amnesty to taxpayers who voluntarily disclosed their participation in abusive tax shelters. (Id. at ¶ 26). Subsequently, in June 2003, the IRS banned the Son of BOSS

3

shelter. (Id. at ¶ 27). On May 5, 2004, the IRS announced a settlement offer directed at Son of BOSS shelter participants, which a Chuhak attorney forwarded to McMahan the very next day. (Id. at ¶¶ 28, 29). Chuhak also forwarded an IRS notice that indicated that "Son of Boss transactions are abusive and were . . . undertaken solely to create tax benefits unintended by any reasonable interpretation of the tax laws." (Id. at ¶ 29). In January 2005, a Chuhak attorney informed McMahan that the state of Illinois had also determined that the Son of BOSS shelter was abusive and one of a series of reportable transactions, and that it was offering Son of BOSS participants an opportunity to participate in a voluntary compliance program. (Id. at ¶ 30). McMahan did not participate in any of the federal or state amnesty or compliance programs. (Id. at ¶ 31).

In February 2005, the IRS notified McMahan that it was auditing his 2001 tax returns. (Id. at ¶ 32). On October 26, 2010, the IRS issued a Notice of Final Partnership Administrative Adjustment ("NFPAA") with respect to McMahan's 2001 tax returns. (Id. at ¶ 33). The notice disallowed the Son of BOSS shelter and made an upward adjustment of McMahan's 2001 taxable income. (Id.). McMahan settled with the IRS on May 10, 2012. (Id. at ¶ 35).

McMahan filed the instant action on March 26, 2012.

**Legal Standard**

Summary judgment is appropriate when the evidence demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court must construe all facts and reasonable inferences in favor of the non-moving party. *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (internal quotation marks omitted). "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could

4

reasonably find for the non-moving party." *Madison v. Frazier*, 539 F.3d 646, 652 (7th Cir. 2008) (citations omitted). Further, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *Dorsey*, 507 F.3d at 627 (citation omitted).

**Analysis**

Plaintiffs first argue that Deutsche Bank's motion improperly asks this Court to reconsider Judge Zagel's order holding that all of Plaintiffs' claims were timely because they were filed less than two years after the October 26, 2010, IRS deficiency notice. (Dkt. 46 (dated April 5, 2013)). Judge Zagel's ruling on the timeliness issue was based on *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 2012 IL 112219 (Ill. 2012), where the Illinois Supreme Court addressed the application of the Illinois discovery rule to claims brought by investors who suffered losses in a tax shelter similar to Son of BOSS. On April 14, 2016, Deutsche Bank filed a motion for a Rule 16 pretrial conference, (Dkts. 112, 113), which brought *Lane v. Deutsche Bank, AG*, 44 N.E.3d 548, 2005 IL App (1st) 142968 (Ill. App. Ct. 2015), *pet. den.*, No. 120195 (Mar. 30, 2016), to Judge Zagel's attention. Deutsche Bank requested that Judge Zagel reconsider his 2013 order in light of *Lane*, arguing that *Lane* clarified *Khan*, order a brief discovery period limited to statute of limitations evidence, and set a summary judgment briefing schedule. Judge Zagel granted the motion in all respects, over Plaintiffs' objection, and ordered limited discovery on the statute of limitations. Plaintiffs and Deutsche Bank subsequently engaged in limited discovery. This Court set a summary judgment briefing schedule, and Plaintiffs did not object. Accordingly, this Court treats the instant motion as a proper motion for summary judgment, not an improper motion to reconsider.

Plaintiffs' aiding and abetting claim against Deutsche Bank is subject to a five-year statute of limitations. 735 ILCS 5/13-205. This limitations period commences when the cause of action accrues or when facts exist that authorize the bringing of a cause of action. *Lane*, 44 N.E.3d at 553 (citing *Khan*, 978 N.E.2d at 1028). The Illinois discovery rule, however, delays the start of the

limitations period until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused. *Khan*, 978 N.E.2d at 1028-29 (citations omitted). Upon discovery of a wrongfully caused injury, a party is obligated to inquire further to determine whether an actionable wrong was committed. *Marvel Eng'g Co. v. Matson, Driscoll & D'Amico*, 501 N.E.2d 948, 952, 150 Ill. App. 3d 787 (Ill. App. Ct. 1986) (citations omitted). A party need not know the full extent of his injury before the statute of limitations is triggered. *Lane*, 44 N.E.3d at 555 (citing 978 N.E.2d at 1029). For Plaintiffs' claim against Deutsche Bank to have been timely, it must have accrued or been discovered no earlier than March 26, 2007.

The main point of contention between Plaintiffs and Deutsche Bank is when the limitations period on the remaining claim started to run. Plaintiffs argue that *Khan* establishes a bright-line rule that the limitations period in an accountant malpractice case involving increased tax liability only begins to run when a party receives a deficiency notice from or settles tax disputes with the IRS. Deutsche Bank relies on *Lane* for the proposition that *Khan* does not establish such a bright-line rule and that limitations period analyses should be done on a case-by-case basis.

At issue in *Lane* was the statute of limitations. The court rejected plaintiff's argument that *Khan* set forth a bright-line rule that the limitations period did not begin to run in a taxpayer suit until the IRS issued a deficiency notice. *Lane*, 44 N.E.3d at 553, 54. Rather, the court distinguished *Khan* and held that there, the notice of deficiency was what allowed the plaintiff's to *discover* their injuries. *Id.* at 554.

In both *Khan* and *Lane*, the plaintiffs participated in tax shelters that were later disallowed. *Khan*, 978 N.E.2d at 1023, 1027; *Lane*, 44 N.E.3d at 551. The plaintiffs sued for losses incurred, including fees paid and tax penalties, as a result of participating in the tax shelters. *Khan*, 978 N.E.2d at 1023; *Lane*, 44 N.E.3d at 554-55. The defendants in each case represented that the respective tax shelters would withstand legal scrutiny. *Khan*, 978 N.E.2d at 1027; *Lane*, 44 N.E.3d at 551. After

6

the IRS disallowed tax shelters similar the ones used by the plaintiffs, the defendants discouraged the plaintiffs from participating in tax amnesty programs. *Khan*, 978 N.E.2d at 1027; *Lane*, 44 N.E.3d at 551. The plaintiffs filed their respective suits after the IRS issued deficiency notices. *Khan*, 978 N.E.2d at 1031; *Lane*, 44 N.E.3d at 552.

In *Khan*, the Illinois Supreme Court held that the limitations period began to run for the plaintiffs when the IRS issued the deficiency notice. 978 N.E.2d at 1036. The court reached this conclusion after finding that the defendants' efforts to conceal the nature of the tax shelter and their efforts to discourage participation in the amnesty programs prevented the plaintiffs from discovering the wrongful nature of their injuries and that they had been deprived of the benefit of the tax shelter. *Id.* at 1031, 36, 37. In *Lane*, the court similarly found that, because of the defendants' concealment efforts, the plaintiff was not immediately aware of the wrongful nature of his injuries. 44 N.E.3d at 555. The difference between the two, however, is that the post-concealment events in *Lane*, including the plaintiff's participation in the government's investigation into abusive tax shelters, the audit of his company, and the criminal convictions of individuals involved in promoting the shelter, put the plaintiff on notice that the loss of his initial investment was wrongful. *Id.*

The Illinois Appellate Court held that the plaintiff's claims in *Lane* accrued when the defendants convinced him to invest in the tax shelter and that he was not made aware of the *extent* of his injuries, including the tax related consequences of implementing the shelter, until he received the deficiency notice. *Id.* at 554-55. The court also concluded that the plaintiff should have been aware of the wrongfulness of his injury, at the latest, by 2008 when individuals involved in promoting the shelter started pleading guilty to related criminal charges. *Id.* at 555, 56. Accordingly, the court found that the plaintiff's claims, which were filed nearly six years later in 2014, were untimely. *Id.* at 556.

Following *Lane*, this Court turns to an analysis of the record to determine when Plaintiffs' claim against Deutsche Bank accrued and when it was or should have been discovered. 44 N.E.3d at 553, 54-55. The undisputed evidence demonstrates that Plaintiffs claim against Deutsche Bank accrued, at the latest, in 2001, when Plaintiffs paid fees related to transactions necessary to implement the Son of BOSS shelter. *Lane*, 44 N.E.3d at 554-55 (injury occurred when plaintiff was induced to pay substantial fees based on misrepresentations of fact and breaches of duty); *Khan*, 978 N.E. 2d at 1030-31 (a portion of the plaintiffs' injuries occurred upon payment of fees to participate in tax shelter that was later disallowed).

The next question this Court must address is when Plaintiffs discovered or should have discovered the wrongfulness of the injury. *Lane*, 44 N.E.3d at 553. Plaintiffs argue that Deutsche Bank and the other defendants misled them as to the legality of the Son of BOSS shelter, therefore the date the IRS issued the NFPAA should be the start of the limitations period. Deutsche Bank, however, contends that Plaintiffs were or should have been aware of the wrongful nature of their injury well before March 26, 2007.

While it is true that Plaintiffs were not immediately aware of their harm because of Defendants' misrepresentations about the Son of BOSS shelter, the record makes it clear that several events between 2002 and 2005 put Plaintiffs on notice of their injury and its wrongful cause. *Lane*, 44 N.E.3d at 555. First, in 2002, Goldstein informed Plaintiffs that the Son of BOSS shelter was not legitimate. Next, Plaintiffs retained Chuhak as tax counsel, and a Chuhak attorney informed them of the 2004 IRS and Illinois settlement and amnesty programs. The Chuhak attorney was explicit about how the IRS and the State of Illinois viewed the Son of BOSS shelter and the benefits of these programs, such as when he wrote the following to McMahan: "The State of Illinois has passed legislation increasing the amount of interest and penalties . . . for taxpayers that have participated in reportable transactions that have been determined to be abusive . . . The Son of Boss

and other similar transactions fall into this classification." (Dkt. 143-7 at 1; *see also* Id. at 3 (discussing the benefits of participating in a voluntary compliance program)). The Chuhak attorney also instructed Deutsche Bank to not disclose McMahan's identity to the IRS, demonstrating knowledge about the wrongfulness of the Son of BOSS shelter. (Dkt. 143-4). Furthermore, in February 2005, the IRS notified Plaintiffs that it was auditing their 2001 tax returns which had been prepared using the Son of BOSS shelter. Finally, Deutsche Bank points this Court to McMahan's involvement in the *Denney* suit, a case that shares similar allegations, claims, and defendants with the case at bar. Apart from Chuhak sending McMahan a notice of settlement in February 2005, the extent of Plaintiffs' involvement in the suit is unclear.

Plaintiffs offer an affidavit in support of its opposition to summary judgment. Plaintiffs claim that Defendants downplayed the significance of and encouraged them not to participate in the amnesty and settlement programs. Plaintiffs' brief and affidavit, however, fail to offer any evidence, point to anything in the record, or give details about the advice the Defendants gave them regarding the programs. They also claim that they did not authorize the Chuhak attorney's communications with Deutsche Bank. Plaintiffs further contend that the notice of settlement did not make them aware that they had suffered any injury. This contention, however, is contradicted by McMahan's admission that he believed he was entitled to a refund of what he calls "illegitimate" attorney's fees paid to Jenkens. (Dkt. 140-1 ¶ 23).

This Court finds that there are no genuine issues of material fact. Plaintiffs' injury occurred in 2001 when they paid their fees to Defendants, and the record demonstrates that Plaintiffs were or should have been aware of the wrongful nature of the Son of BOSS shelter and the wrongful nature of their injury by February 2005, if not sooner. To the extent Plaintiffs argue that they did not know they had a cause of action, this Court finds they were obligated to make an inquiry into whether causes of action for their injury existed. *Marvel Eng'g Co.*, 501 N.E.2d 948, 952. Plaintiffs were

therefore required to file their complaint by February 2010. 735 ILCS 5/13-205. Accordingly, this Court finds that the remaining claim was untimely because Plaintiffs filed their complaint on March 26, 2012, outside the limitations period.

**Conclusion**

For the foregoing reason, Deutsche Bank's motion for summary judgment [140] is granted. This case is terminated.

IT IS SO ORDERED.

_____
SHARON JOHNSON COLEMAN
United States District Judge

DATED:  September 5, 2017